UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA

DAVID CAPERS,                          )
                                       )
                    Movant,            )
                                       )
        v.                             )        Crim No. 3:17-cr-00022-RLY-CSW-1
                                       )
UNITED STATES OF AMERICA,              )
                                       )
                    Respondent.        )

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Movant, DAVID CAPERS ("Capers"), appearing *pro se,* and in support of this memorandum would show as follows:

## I. JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582. The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is black-letter law that a federal court generally "may not modify a term of imprisonment once it has been imposed." *Id.* However, Congress has allowed an exception to that rule "in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing

1

Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.    Procedural Background

On June 29, 2017, a grand jury sitting in the United States District Court for the Southern District of Indiana, Evansville Division, returned a three (3) Count Indictment charging Capers and seven other co-defendants. See Doc. 39.[1] Count 1 charged Capers with Conspiracy to Possess with Intent to Distribute and to Distribute 1 Kilogram or More of Heroin, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A), and 846. *Id*. The Indictment also contained Forfeiture Allegation pursuant to 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c). *Id*.

On September 16, 2019, Plea and Sentencing Hearing were held. See Doc. 300. Capers was sentenced to a term of 200 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Doc. 301.

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Southern District of Indiana, Evansville Division in Criminal No. 3:17-cr-00022-RLY-CSW-1, which is immediately followed by the Docket Entry Number. "PSR" refers to the Presentence Report in this case, which is immediately followed by the paragraph ("¶") number.

On May 14, 2021, Capers filed a Motion under 28 U.S.C. § 2255 to Vacate, Set

Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"), which

remains pending as of the date of this filing. See Docs. 383, 384.

**B.**     **Statement of the Relevant Facts**

1.     Relevant Offense Conduct

Between August 1, 2016, and May 25, 2017, the defendant and seven
co-defendants conspired to possess with the intent to distribute and to
distribute one kilogram or more of heroin. Emanuel Brewster, Jr., and
Harry Campbell were leaders and supervisors of the conspiracy and
would obtain large quantities of heroin from their sources of supply in the
Chicago, Illinois, area.

During the wiretap surveillance, Brewster, Jr, often referred to his source
of supply as "Dave." On May 9, 2017, after a phone call with Brewster,
Jr., law enforcement positively identified the source as the defendant.
After his arrest, Campbell also confirmed his source of supply to be the
defendant.

On May 24, 2017, Bretton Vaughn possessed approximately 112 grams
of heroin in Evansville, Indiana. There heroin was supplied by the
defendant and intended for delivery to Brewster for distribution. Later,
Vaughn positively identified the defendant and placed a recorded call to
him in the presence of law enforcement.

From August 1, 2016, through May 25, 2017, the defendant supplied at
least three kilograms of heroin, but less than 10 kilograms of heroin, to his
co-defendants in the Southern District of Indiana for further distribution.

See PSR ¶¶ 6-9.

2.     Plea Proceeding

On September 16, 2019, a Plea Hearing was held before Judge Richard L. Young. See Doc. 300. Capers filed a petition to plead guilty without the benefit of a plea agreement. *Id.* The case was referred to the Probation Office for the preparation of the Presentence Report ("PSR").

### 3.    Presentence Report Calculations and Recommendations

On March 12, 2019, the Probation Office prepared Capers' PSR. The 2018 edition of the Guidelines Manual, incorporating all guideline amendments, was used to determine Capers' offense level. See PSR ¶ 14. Count 1: Conspiracy to Possess with Intent to Distribute and to Distribute 1 Kilogram or More of Heroin calls for a Base Offense Level of 32 because Capers was held accountable for more than 3 kilograms of heroin, but less than 10 kilograms of heroin, pursuant to USSG § 2D1.1(c)(4). See PSR ¶ 15. Further, Capers was deemed to be a career offender within the meaning of USSG § 4B1.1, therefore his offense level is 37. See PSR ¶ 21. Capers received a 3-level reduction for acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b). See PSR ¶¶ 22-23. The PSR calculated Capers' Total Offense Level to be level 34. See PSR ¶ 24. Capers was designated as a career offender under USSG § 4B1.1(b), he was assigned a Criminal History Category of VI. See PSR ¶ 36. Based upon a Total Offense Level of 34 and a Criminal History Category VI, the Guideline imprisonment range was 262 to 327 months. See PSR ¶ 68.

4.    Sentencing and Postconviction Proceedings

On September 16, 2019, the Court held a combined plea and sentencing hearing before Judge Richard L. Young. See Doc. 300 The Court accepted the plea and adjudged Capers guilty as charged. *Id.* The Court sentenced Capers for a term of 200 months' imprisonment. See Doc. 301. It is followed by 60 months' Supervised Release. *Id.* The Court also ordered payment of Mandatory Special Assessment Fee of $100. *Id.* No direct appeal was filed in this case.

On May 14, 2021, Capers filed a § 2255 Motion, which is still pending before this Court. See Docs. 383, 384.

## III. **DISCUSSION**

As a preliminary matter, Capers respectfully requests that this Court be mindful that *pro se* pleadings are to be construed liberally. See *United States v. Norwood*, 602 F.3d 830 (7th Cir. 2010) (*Pro se* pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers, and should therefore be liberally construed); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (same).

### A.    **Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence**

This Court has the power to adjust Capers' sentence. District courts no longer

5

need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.   Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

The Committee believes that there may be unusual cases in which an

6

eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id.* at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id.* Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

2.  <u>Section 3582(c)(1)(A) is Not Limited To Medical, Elderly or Childcare Circumstances</u>

Congress initially delegated the responsibility for determining what constitutes "extraordinary and compelling reasons" to the United States Sentencing Commission. 28 U.S.C. § 994(t) ("The Commission…shall describe what should be considered "extraordinary and compelling reasons" for sentence reduction, including the criteria to be applied and a list of specific examples." Congress provided one limitation to that authority: "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could,

however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States Sentencing Commission hereby submits to the Congress the following amendments to the Guidelines Manual and the reasons therefor. As authorized by such section, the Commission specifies an effective date of November 1, 2023, for these amendments:

(b)     *Extraordinary and Compelling Reasons.–* Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:

    (1)     *Medical Circumstance of the Defendant.–*

        (A)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.

        (B)     The defendant is—

            (i)     suffering from a serious physical or medical condition,

            (ii)     suffering from a serious functional or cognitive impairment, or

            (iii)     experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

        (C)     The defendant is suffering from a medical condition that requires long-term or specialized medical care

that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D)    The defendant presents the following circumstances—

        (i)    the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

        (ii)    due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

        (iii)    such risk cannot be adequately mitigated in a timely manner.

(2)    *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3)    *Family Circumstances of the Defendant.*—

(A)    The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

(B)    The incapacitation of the defendant's spouse or

registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(C)     The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

(D)     The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

(4)     *Victim of Abuse.*— The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

(A)     sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

(B)     physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a

10

criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5)  *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6)  *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances.

This amendment responds to, among other things, the First Step Act of 2018 ("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a sentence reduction upon a defendant's own motion. Previously, a court was authorized to do so only upon the motion of the Director of the Bureau of Prisons ("BOP"). Congress amended the law for the express purpose, set forth on the face of the enactment, of "increasing the use" of sentence reduction motions under section 3582(c)(1)(A). First

Step Act § 603(b).

### 3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among other things, transformed the process for compassionate release. *Id.* at § 603. Now, instead of depending upon the BOP to determine an inmate's eligibility for extraordinary and compelling reasons and the filing of a motion by the BOP, a court can resentence "upon motion of the defendant." A defendant can file an appropriate motion if the he or she has exhausted all administrative remedies or "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as … improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4.    Capers Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

In this case, Capers filed a Reduction in Sentence to the Warden, FCI Beckley on October 10, 2025, however, he did not receive any response, yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Capers's behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.    The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.**

Section 3582(c) states that a district court cannot modify a term of imprisonment once it has been imposed except that, in any case:

13

The court, upon motion of the Director of the Bureau of Prisons, or the defendant, pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

> (i)    extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least five extraordinary and compelling reasons warranting such a reduction, discussed as follows:

### 1.    Requests Based on Non-Medical Circumstances– Incapacitation of   the Prisoner's Mother Due to Health   Issues

Capers respectfully submits this Motion for a Reduction in Sentence ("RIS") pursuant to 18 U.S.C. § 3582(c)(1)(A), commonly known as the compassionate release statute, on the grounds of extraordinary and compelling family circumstances. Capers seeks a sentence reduction so that he may return home to serve as the primary caregiver for his mother, Kathy Ball ("Ball"), who suffers from numerous incurable and progressively debilitating medical conditions. These conditions include, but are not limited to: Bilateral Carotid Artery Stenosis, Depression, Elevated Alkaline Phosphatase Level, Epigastric Pain, External Hemorrhoids, Gait Instability, Left-Sided Lacunar Infarction, Left-Sided Weakness, Lesion of the Right Frontal Lobe of the

Brain, Normocytic Anemia, Osteoporosis, Stenosis of the Left Vertebral Artery, Vitamin D Deficiency, and Weakness of the Left Lower Extremity. Additionally, Ball has a documented history of a cerebrovascular accident (stroke) and a non-ST elevation myocardial infarction (NSTEMI). See Exhibit 1.

Due to the severity and progressive nature of her illnesses, Ball's functional capacity has significantly declined. Since September 21, 2022, she has required the use of a walker to assist with mobility. Currently, she relies on a home health aide to accompany her to medical appointments and assist with daily activities, as her mobility and strength are substantially limited. In fact, Ball requires around-the-clock care; however, she currently receives only 17 hours of assistance per week. Her husband, who is 80 years old, is unable to provide adequate support or medical assistance due to his own advanced age and health limitations.

Although Capers has two siblings, neither is in a position to assume the role of caregiver. His brother resides in Atlanta and is the sole provider for his own family, making it impractical for him to relocate or provide full-time care. Meanwhile, Capers' sister recently underwent hip surgery and is currently recovering; she is also scheduled for a second hip operation, further preventing her from caring for their mother.

The U.S. Sentencing Guidelines recognize that family circumstances, particularly when an incarcerated individual is the only available caregiver for an incapacitated or

ailing family member, may justify compassionate release (U.S.S.G. § 1B1.13). Courts have granted similar requests where a defendant's presence was deemed necessary to care for a terminally ill or incapacitated family member.

For example, in *United States v. Bucci*, 409 F. Supp. 3d 1 (D. Mass. 2019), the court granted compassionate release where the defendant was the sole available caregiver for his ailing mother, emphasizing the extraordinary nature of the circumstances. Similarly, in *United States v. Lisi*, 440 F. Supp. 3d 246 (S.D.N.Y. 2020), the court recognized that caring for an ailing parent may constitute an extraordinary and compelling reason for sentence reduction.

Given these circumstances, Capers requests the Court's consideration for compassionate release so that he may fulfill the essential and irreplaceable role of primary caregiver for his ailing mother.

## 2.    Erroneous Application of the Career Offender Enhancement

In this case, the District Court erred in determining that Capers was a career offender within the meaning of USSG § 4B1.1(a), which provides:

> A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

16

Capers was over 18 years of age when he committed this offense, and it was a "controlled substance offense" within the meaning of USSG § 4B1.1(a). His sentence was therefore subject to being enhanced under the "Career Offender" Guidelines provision, § 4B1.1, if he had "at least two prior felony convictions of either a controlled substance offense or a crime of violence. "The PSR construed USSG § 4B1.2, which defines a "controlled substance offense" and a "crime of violence."

Capers was sentenced as a career offender because before he was convicted in federal court of the present offense, Capers has at least two prior felony convictions, enumerated as follows:

(1)    July 20, 2001: Manufacturing or Delivery of 30-500 grams of Cannabis, in Cook County Circuit Court, Chicago, IL (Doc. No. 02-cr-0577301); and

(2)    May 9, 2002: Unlawful Possession with Intent to Delivery of 30-500 Grams of Cannabis, in Iroquois County Circuit Court, Watseka, IL, (Doc. No. 02-cr-58).

Here, Capers contends that his—Delivery of a Controlled Substance in the Circuit Court for Cook County, in violation of 720 ILCS 550/5—should not have been classified as a "controlled substance offense" for the purpose of § 4B1.1(a)(3) because the elements of that Illinois crime differ from the definition in §4B1.2(b).

Illinois Controlled Substances Act: 720 ILCS 550/5, states:

§ 5. Except as otherwise provided in the cannabis regulation and tax act

and the industrial hemp act, it is unlawful for any person knowingly to manufacture, deliver, or possess with intent to deliver, or manufacture cannabis, any person who violates this section with respect to:

(A)  not more than 2.5 grams of any substance containing cannabis is guilty of a Class B misdemeanor;

(B)  more than 2.5 grams but not more than 10 grams of any substance containing cannabis is guilty of a Class B misdemeanor;

(C)  more than 10 grams but not more than 30 grams of any substance containing cannabis is guilty of a Class IV felony;

(D)  more than 30 grams but not more than 500 grams of any substance containing cannabis is guilty of a Class 3 felony for which a fine not to exceed $50,000 may be imposed;

Section 4B1.2 of the Guidelines defines a controlled substance offense as follows:

an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense. USSG § 4B1.2(b).

The question in this case is whether the Illinois statutes under which Capers was convicted are "divisible." *See, e .g ., Descamps v. United States*, 133 S.Ct. 2276, 2281 (2013). A statute is "divisible" when it "sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building *or* an automobile." *Id.*

As the Supreme Court explained in *Descamps*:

18

"[i]f one alternative (say, a building) matches an element in the generic offense, but the other (say, an automobile) does not, the modified categorical approach permits sentencing courts to consult a limited class of documents, such as indictments and jury instructions, to determine which alternative formed the basis of the defendants prior conviction."

*Id.*

See *United States v. Hinkle*, 832 F.3d 569 (5ᵗʰ Cir. 2016), defendant Hinkle appealed his sentence, contending that the district court erred in determining that he was a career offender within the meaning of USSG § 4B1.1(a). Hinkle argued that neither of his prior Texas convictions, one for burglary and the other for delivery of a controlled substance, constituted a predicate offense under the career-offender guidelines provision. The Court's decision turned upon whether the particular Texas statutes at issue were divisible such that a court may use the modified categorical approach to determine whether a defendant convicted under Texas law of knowingly delivering a controlled substance was convicted of delivery by one of the particular means proscribed under Texas law. In light of the Supreme Court's recent decision in *Mathis v. United States*, 136 S. Ct. 2243 (2016), the *Hinkle* Court concluded that his conviction for delivery of a controlled substance is not a "controlled substance offense" within the meaning of the Guidelines, and therefore, the career-offender enhancement did not apply based on the record presently before the Court. The Court vacated Hinkle's sentence and remanded for resentencing without the career offender Guideline

19

enhancement.

The definition of "deliver" in section 481.002(8) in conjunction with section 481.112(a) sets forth different offenses, such that delivering a controlled substance by "offering to sell" it is a separate and distinct offense from delivering a controlled substance by "transfer[ing], actually ..., to another a controlled substance." Hinkle contends that the various definitions of "deliver" in section 481.002(8) of the Texas statute are not elements of separate offenses but are various means of committing the offense of "deliver[ing] ... a controlled substance." The Government contends that the Texas indictment can be used to "narrow" the offense of which Hinkle was convicted to the offense of "deliver[ing] ... a controlled substance" by "transfer[ing] [it] actually ... to another." Both rely on *Descamps* in support of their respective positions.

In *Hinkle*, under the categorical approach, the government conceded that a conviction of delivering a controlled substance "by offering to sell" that substance, the crime would not come within the definition of a "controlled substance offense" under § 4B1.2.

Capers asserts that his prior state felony conviction in violation of 720 ILCS 550/5(d) does not qualify as predicate offense to enhance his sentence under § 4B1.1, because it does not violate the Controlled Substance Act under 21 U.S.C. § 841(a)(1).

To determine whether Capers' conviction under 720 ILCS 550/5(d) would

qualify as a "controlled substance offense," we need to look to the statutory elements under which he was previously convicted, rather than the underlying conduct or facts giving rise to that conviction. See *Gomez-Perez v. Lynch*, 829 F.3d 323 (5th Cir. 2016); *United States v. Tanksley*, (No. 15-11078) (5th Cir. Jan. 18, 2017) (applying the categorical approach to the "controlled substance offense" definition). This analysis requires a categorical comparison between the predicate offense of conviction and the federal definition. First, "we ask whether the statute of conviction is a categorical match to the generic predicate offense; that is, if the statute of conviction criminalizes only as much (or less) conduct than the generic offense." *Medina-Lara v. Holder*, 771 F.3d 1106, 1112 (9th Cir. 2014); *Taylor*, 495 U.S. at 600; *Rendon*, 2014 WL 4115930, at *2. The parties do not dispute that the statute of conviction is "overbroad." See *id*. Thus, we next "ask if the statute of conviction's comparatively "overbroad" element is divisible." *Id*. If a predicate statute is divisible—i.e., it lists alternative elemental versions of the offense within the same statute, rather than simply separate means for committing a single offense—then the modified categorical approach is used to determine which elemental version of the offense was committed. See *Mathis v. United States*, 136 S. Ct. 2243, 2249 (2016). In such a case, "a sentencing court looks to a limited class of documents" from the record of a prior conviction to determine which version of the offense was the basis for that conviction. *Id*. (citing *Shepard v. United*

*States*, 544 U.S. 13, 26 (2005)). The limited class of documents includes "the terms of the charging document, the terms of the plea agreement or transcript of colloquy between judge and defendant in which the factual basis for the plea was confirmed by the defendant, or to some comparable judicial record of this information." *Shepard*, 544 U.S. at 26. In the context of a guilty plea, that inquiry is "limited to assessing whether the defendant 'necessarily admitted' the elements of the particular statutory alternative that is a categorical match" with the federal definition.

Here, Capers contends that the Illinois law should be treated the same way. The key phrase in § 4B1.2(b) is "manufacture, import, export, distribution, or dispensing". As with most other recidivist enhancements, these words are applied to the elements of the crime of conviction, not to what the accused did in fact. See, e.g., *Mathis v. United States*, 136 S. Ct. 2243 (2016).

In *Mathis*, the Supreme Court set forth how a court determines whether a statute is divisible and therefore whether, in employing the modified categorical approach, documents pertaining to the prior conviction may be used to ascertain if that conviction comes within a federal definition of an offense or has the elements of an enumerated offense. The decision in *Mathis* plainly and unmistakably leads to the conclusion that the definition of "possession" in section 481.002(8), as authoritatively interpreted by the Texas Court of Criminal Appeals sets forth various means of committing an offense

and does not set forth in the disjunctive separate offenses. See *Lopez v. State*, 108 S.W.3d 293, 299 (Tex. Crim. App. 2003) (citing *Rodriguez v. State*, 89 S.W.3d 699, 701 (Tex. App.—Houston [1st Dist.] 2002, pet ref'd)).

The Supreme Court's decision in *Mathis* dealt with the Armed Career Criminal Act (ACCA), not the federal enhancement sentencing. However, the primary focus of the Court's decision in *Mathis* was how to determine whether a statute is "divisible" and therefore whether the modified categorical approach can be used to determine, when a statute defines more than one offense, of which offense a defendant was convicted. *Id.* The decision in *Mathis* clarified when and how the modified categorical approach is applied in the context of federal sentencing. With exceptions not relevant to this appeal, courts generally used the categorical and modified categorical approaches in applying the federal sentencing Guidelines. See, *e .g .*, *United States v. Sykes*, 844 F.3d 712 (8th Cir. 2016) (citing *Taylor v. United States*, 495 U.S. at 602, 110 S.Ct. 2143). The *Mathis* decision is controlling regarding the methodology of the modified categorical approach, and courts must now apply its holdings, even if they are contrary to prior precedent of this court.

The decision in *Mathis* instructs that there is a difference between alternative elements of an offense and alternative means of satisfying a single element. See *Mathis*, 136 S.Ct. at 2250. Elements must be agreed upon by a jury. *Id.* at 2256. When a jury

is not required to agree on the way that a particular requirement of an offense is met, the way of satisfying that requirement is a means of committing an offense not an element of the offense. *Id.* At issue in *Mathis* was an Iowa burglary statute that proscribed entry into or onto locations that included a building, a structure, land, water or an air vehicle. *Id* . at 2250; *see also,* Iowa Code§§ 702.12, 713.1. Because generic burglary does not proscribe burglary of vehicles, the Iowa offense was overly inclusive; it included conduct that was not generic burglary. *Mathis,* 136 S.Ct. at 2250. The sentencing court looked to the documents pertaining to Mathis prior convictions, which revealed that Mathis had burgled structures not vehicles, and the district court concluded that the sentencing enhancement under the ACCA applied. The Eighth Circuit affirmed, holding that whether the itemized list of places "amount[ed] to alternative elements or merely alternative means to fulfilling an element, the statute is divisible, and we must apply the modified categorical approach." The Supreme Court disagreed and reversed the Eighth Circuit because the Iowa Supreme Court has held that the Iowa statute sets forth "alternative method[s] of committing [the] single crime," and an Iowa "jury need not agree on which of the locations was actually involved." *Mathis* , 136 S.Ct. at 2250 (quoting *State v. Duncan,* 312 N.W.2d 519, 523 (Iowa 1981)).

If the elements of the defendant's crime of conviction criminalizes a "greater

swath of conduct than the elements of the relevant [Guidelines] offense" [*Mathis*, 136 S. Ct. at 2251] . . . [T]his "mismatch of elements" means that his conviction for the knowing possession with intent to deliver is not a controlled substance offense under the Guidelines. *Id*. That prior conviction cannot serve as a predicate offense under the Career Offender Guideline provision, which is § 4B1.1. *Id*.

Violation of 720 ILCS 550/5(d)—should not have been classified as a "controlled substance offense" for the purpose of § 4B1.1(a)(3) because the elements of that Illinois crime differ from the definition in § 4B1.2(b).

Furthermore, Capers should not be classified as a career offender under U.S.S.G. § 4B1.1 because his prior Illinois state convictions for Manufacturing or Delivery of 30–500 grams of Cannabis and Unlawful Possession with Intent to Deliver 30–500 grams of Cannabis no longer qualify as predicate controlled substance offenses under federal law, particularly in light of changes brought by the Agriculture Improvement Act of 2018 (commonly referred to as the "2018 Farm Bill").

The 2018 Farm Bill, signed into law on December 20, 2018, significantly amended the Controlled Substances Act (CSA) by removing "hemp" from the definition of marijuana. Specifically, the CSA, as amended by the Farm Bill, defines "hemp" as Cannabis sativa L. with a delta-9 tetrahydrocannabinol (THC) concentration of not more than 0.3 percent on a dry weight basis. See 7 U.S.C. § 1639o(1). As a

result, not all cannabis-related offenses under state law remain categorically controlled substance offenses under federal law—particularly where the state law criminalizes hemp or substances that are not federally controlled.

This distinction has led courts to reconsider the use of state cannabis convictions as qualifying predicates under federal sentencing guidelines:

In *United States v. Bautista*, 989 F.3d 698 (9th Cir. 2021), the Ninth Circuit held that a California conviction for possession of marijuana for sale could not serve as a predicate offense under the sentencing guidelines because California law included hemp within its definition of marijuana, while federal law (post-2018) excluded hemp. The court found that the state offense was overbroad and not a categorical match with the federal definition of a controlled substance.

Similarly, in *United States v. Perez*, 46 F.4th 691 (7th Cir. 2022), the Seventh Circuit recently clarified the applicable legal framework in *United States v. Ruth*, 966F.3d642 (7th Cir. 2020), holding that a "controlled substance offense" under U.S.S.G. §4B1.2(b) includes state-law offenses—even if the state statute criminalizes substances not listed in the federal CSA. Because the Guidelines themselves define the term to include "an offense under federal or state law" and no longer explicitly refer to the CSA, the court emphasized the plain meaning of "controlled substance," adopting a generic approach. Accordingly, under *Ruth*, an Illinois conviction for

cannabis—despite potentially criminalizing hemp—still counts as a predicate offense unless Illinois law specifically excludes hemp or is divisible in a way that would allow parsing out only the CSA-covered portions. Illinois Controlled Substances Act: 720 ILCS 550/5(d), under which Capers was convicted specifically sates that, "any substance containing cannabis." This catch all statement shows the intent of the statute, emphasizing that the substances are separate under the statute but combined with no separation distinguishing them under the punishment regardless of the substance. Hemp is defined as cannabis with a THC concentration of 0.3% or less on a dry weight basis and regulated under the Illinois Department of Agriculture. This statute clearly states.

Section 5, except as otherwise provided in the cannabis regulation and tax act and the industrial hemp act, it is unlawful for any person knowingly to manufacture, deliver, or possess with intent to deliver, or manufacture cannabis. Hemp aligned directly in the true definition of cannabis.

Illinois law, under which Capers was convicted, criminalized the manufacture, delivery, and possession with intent to deliver cannabis without distinguishing between marijuana and hemp, at least prior to alignment with the Farm Bill. Because Illinois law did not exempt hemp until after Capers' convictions, it is overbroad in comparison to the federal definition and fails the categorical approach required under *Taylor v. United States*, 495 U.S. 575 (1990). Accordingly, Capers' prior cannabis-related convictions

cannot be deemed controlled substance offenses under federal law and should not be used to qualify him as a career offender.

Given this shift in federal law and persuasive appellate precedent, Capers respectfully submits that his prior convictions for cannabis-related offenses—no longer recognized as federally controlled substances—cannot support his classification as a career offender under the Guidelines.

That showed that Capers was convicted of a controlled substance on that conviction. But when you shift to PSR ¶¶ 31, 32, both convictions says cannabis which are distinctively different from a controlled substance by Illinois law, 72-/570-401.

¶ 31    July 20, 2001: Manufacturing or Delivery of 30-500 grams of Cannabis, in Cook County Circuit Court, Chicago, IL (Doc. No. 02-cr-0577301); and

¶ 32    May 9, 2002: Unlawful Possession with Intent to Delivery of 30-500 Grams of Cannabis, in Iroquois County Circuit Court, Watseka, IL, (Doc. No. 02-cr-58).

There is no mistake that in order to be deemed as a career offender under USSG § 4B1.1(a), which provides:

A defendant is a career offender if (1) the defendant was at least eighteen years old at the time the defendant committed the instant offense of conviction; (2) the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense; and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.

28

Illinois lists 20–30 controlled substances under statute 720 ILCS 570/401. So, if Illinois does not list cannabis as a controlled substance by statute, it can't be used as a predicate controlled substance offense because cannabis and hemp are listed under their own statute, and there is no distinction between the two under the criminal code or in convictions. Illinois would have to list cannabis as a controlled substance under its statute in order for it to be a categorical match. Section §4B1.1 states that the convictions have to be for a "controlled substance offense" and a "crime of violence." Because Illinois defines cannabis and hemp together under the same statute without distinguishing a difference between the two, when hemp became legal on the federal level in August 2018, it was removed from the CSA. If the state conviction does not mirror the federal definition of a controlled substance, it can't be used to enhance a defendant's sentence. So, on September 16, 2019, when Capers was sentenced, he received an erroneous application of the career offender enhancement. Capers should never have been deemed a career offender from the start and was sentenced to a greater sentence than necessary to achieve the §3553(a) factors.

Lastly, under USSG §5H1.1, age—including youth—is recognized as a factor that may warrant consideration in sentencing. While age alone is not ordinarily a reason to depart from the guidelines, the provision explicitly allows courts to consider youthful offenders for a downward departure or as a mitigating factor in determining the

reasonableness of a sentence. Courts have acknowledged that individuals in their late teens and early twenties often display immaturity, impulsivity, and limited capacity for long-term planning, which can influence their criminal conduct.

Scientific research reinforces this principle. Studies show that the prefrontal cortex, the part of the brain responsible for judgment, impulse control, and risk assessment, is one of the last regions to fully mature, continuing structural and functional development well into the mid-20s. (Diamond, Annual Review of Psychology, 2013; Casey et al., PNAS, 2013). During this period, young adults are more likely to act on impulse, take risks, and fail to fully anticipate the consequences of their actions.

In Capers' case, all of the predicate offenses that the Court relied upon to apply the career-offender enhancement were committed before he turned 23—squarely within this scientifically recognized developmental window. At that age, his prefrontal cortex and executive-functioning abilities were still maturing, making him more susceptible to impulsive behavior and poor decision-making. This aligns directly with the guidance in §5H1.1, which allows courts to consider youth as a mitigating factor in sentencing.

Given Capers' subsequent rehabilitation, maturity, and compliance while incarcerated, the combination of his youth at the time of the offenses and the scientific understanding of brain development supports the conclusion that his early offenses

30

should be viewed as less indicative of a lifelong criminal propensity. Consequently, the Court should weigh his youth as a factor in considering a sentence reduction or in evaluating the appropriateness of the career-offender enhancement.    Thus, Capers should be resentenced absent the career offender enhancement.

### 3.    Drug Weight Calculation

The drug weight is an element of the offense and that any fact that increases a mandatory minimum penalty is an element that must be charged in an indictment and proved to a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). Under those two cases, in *Stanback*, if he was sentenced today, his sentence would be based on distributing 5 grams or more of cocaine base, and not 4.5 kilograms of cocaine base.

**Note:** Capers plead guilty for conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin.

In *Apprendi*, the Supreme Court held that the Sixth Amendment to the Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. In *Alleyne*, the Court applied *Apprendi* to the federal mandatory minimum and maximum sentencing scheme

31

and held that because mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an element of the crime that must be submitted to the jury. *Id.* at 116, 133 S.Ct. 2151 (overruling *Harris v. United States*, 536 U.S. 545, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002) ).

Neither *Apprendi* nor *Alleyne* are retroactively applicable on collateral review. See *United States v. Sanders*, 247 F.3d 139, 146 (4th Cir. 2001) (joining other circuits in finding that *Apprendi* does not apply retroactively to cases on collateral review); and *United States v. Stewart*, 540 Fed.Appx. 171 (4th Cir. 2013) (*per curiam*) (noting that *Alleyne* has not been made retroactively applicable to cases on collateral review). However, for a period of time after *Apprendi* was decided, including before passage of the Fair Sentencing Act in 2010, the jury ordinarily made a finding regarding the threshold penalty, but the court could and did impose statutory-minimum penalties regardless of any jury finding. That practice was authorized by *Harris*, and *Alleyne* did not overrule *Harris* until three years later, and three years after the Fair Sentencing Act was enacted. Nonetheless, Congress, when drafting the First Step Act in 2018, surely did not intend for courts to disregard the last six years of Supreme Court federal sentencing jurisprudence and this court declines to do so.

*Alleyne* made clear that in order to preserve a defendant's Sixth Amendment right to a jury trial, any fact that increases the statutory mandatory minimum sentence

is an element of the crime which must be submitted to the jury. *Alleyne*, 570 U.S. at 116, 133 S.Ct. 2151. In this case, Capers pleaded guilty for conspiracy to distribute and possess with intent to distribute 1 kilogram or more of heroin. Under *Alleyne*, this court is not free to ignore that finding and impose a penalty based on at least three kilograms of heroin, but less than 10 kilograms of heroin, as referenced in the PSR. Thus, although *Apprendi* and *Alleyne* are not retroactively applicable on collateral review, this court joins other courts in finding that their holdings are applicable in the context of the First Step Act. See *United States v. Simons*, No. 07-CR-00874, 375 F.Supp.3d 379, 487, 2019 WL 1760840 at *6 (E.D.N.Y. Apr. 22, 2019) (citing *Alleyne* and finding that statutory penalties are determined by facts submitted to a grand jury, trial jury, or established by a guilty plea while findings by a judge may be used to determine a sentence within the statutory penalties and cannot change "the mandatory minimum sentence now applicable"); *United States v. Dodd*, No. 3:03-CR-18-3, 372 F.Supp.3d 795, 2019 WL 1529516 (S.D. Iowa, Apr. 9, 2019) (finding in a First Step Act case that "[b]oth *Apprendi* and *Alleyne* are binding on this Court for sentencings held today."); *United States v. Davis*, No. 07-CR-245(S)(1), 2019 WL 1054554 (W.D.N.Y. Mar. 6, 2019), appeal docketed, No. 19-874 (2d Cir. Apr. 5, 2019) ("[I]t is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act."); see also *United States v. Laguerre*, No. 5:02-CR-30098-3, 2019 WL 861417 (W.D. Va.

Feb. 22, 2019) (relying without discussion on charged drug weight rather than PSR weight to find defendant eligible for relief).

Hence, Capers claims that if he had been prosecuted after passage of the Fair Sentencing Act, the government would have had to allege 1 kilogram or more of heroin, even though he was held accountable for at least three kilograms of heroin, but less than 10 kilograms of heroin.

In sum, applying *Apprendi* and *Alleyne* logic to this case; absent the career offender enhancement, Capers' Base Offense Level would now be 30. See also 2018 Sentencing Guidelines, indicating that "At least 1 KG but less than 3 KG of Heroin," calls for a Base Offense Level of 30, pursuant USSG § 2D1.1(c)(5). With the 3-level reduction, Capers' Total Offense Level would now be 27 in Criminal History Category of V, establishing an advisory Guidelines range of 120 to 150 months, which is a lesser harsh range of sentence. At sentencing, the Court sentenced Capers to 200 months' imprisonment. Applying the same consideration, Capers should be sentenced to a term of 120 months' imprisonment.

> 4.   Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Granted Compassionate Release

With respect to the need to avoid unwarranted sentencing disparities, Capers urges the Court to consider the following cases:

i. *United States v. Clark,* Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020)

- Quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at *6.

ii. *United States v. Brooks,* Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020)

- Quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in USSG § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

iii. *United States v. Walker,* No. 11-381, 2022 WL 1487804 (S.D.N.Y. May 11, 2022)

- Compassionate release was granted to a defendant who was the only available caregiver for a minor child, emphasizing the importance of family responsibilities in such decisions.

Capers is now, in effect, to be re-sentenced today, after the passage of the First Step Act; and the need to avoid unwarranted sentencing disparities is to be assessed at the time of his sentencing today relative to those comparable offenders who have been sentenced following the passage of the First Step Act and compassionate release grants of courts in light of the instant pandemic. Nor does the First Step Act's lack of

retroactivity justify withholding sentencing relief given the overall purpose of the First Step Act amendments, which expressly allowed for the possibility for a sentence reduction based on an individualized assessment of the § 3553(a) factors and other criteria.

Next, Capers argues that a reduction of sentence is warranted to avoid unwanted sentencing disparities, taking into consideration case-specific circumstances related to Capers's character, and in light of his post-sentencing rehabilitation. Capers contends that leaving his current sentence in place creates disparity between Capers and comparably situated defendants. In addition to the need to avoid unwarranted sentence disparities, Capers argues that the unique circumstances of his case warrant a variance.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1st Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4th Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5th Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid

sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012);

*United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) ("A district judge,

however, may exercise his or her discretion and determine a defendant's sentence in

light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7th

Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted

sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556;

*Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8th Cir.

2006) (invalidating a sentence that resulted in unwarranted disparities between the

sentences of the defendant and less culpable members of related conspiracies); *United

States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate

generalized § 3553(a) consideration the district court's decision to compare defendant

with his co-defendants and sentence him in accordance with his role); *United States v.

Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly

account for unwarranted disparities between codefendants who are similarly situated,

and...the district court may compare defendants when deciding a sentence."); *United

States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) ("It is not erroneous for the

district court to have considered the 'unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct' when

the statute specifically mandates such consideration."); *United States v. Mejia*, 597

F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

### 5.    Capers' Remarkable Rehabilitation

Since the beginning of his incarceration, Capers has made significant and sustained efforts toward personal growth and rehabilitation—commonly referred to as "post-conviction rehabilitation." See Exhibit 2. Demonstrating a genuine commitment to self-improvement, Capers has actively pursued educational and vocational opportunities offered by the BOP. To date, he has successfully completed more than 25 BOP-sponsored classes, covering a wide range of topics aimed at developing life skills, improving emotional regulation, and preparing for reentry into society. In addition to his academic efforts, Capers maintains steady institutional employment and is currently enrolled in the Non-Residential Drug Abuse Program (NRDAP), while also participating in other rehabilitative programs concurrently. Capers has worked tirelessly and without pause toward his rehabilitation, fully understanding that his consistent good conduct and active participation in programming are directly tied to the accrual of earned time credits under the First Step Act. Motivated not only by the desire to improve himself but also by the hope of earning early release through lawful means, Capers made a conscious and sustained effort to remain compliant, engaged, and

productive.

However, despite his diligent efforts, Capers has experienced ongoing issues with the calculation of his earned time credits. He has not received fair or accurate credit for the rehabilitative programs he has completed or the good conduct he has consistently demonstrated. This unfair computation undermines the spirit and intent of the First Step Act, which was designed to reward incarcerated individuals who take concrete steps toward reform and reintegration. His dedication extends beyond the classroom and into his daily conduct. Capers has consistently accepted work assignments, which have not only kept him engaged and productive, but also helped instill a strong sense of responsibility and discipline—qualities essential for successful reintegration into the community. These assignments have prepared him to transition into a structured and productive life upon release.

Capers' circumstances have changed significantly due to incidents involving correctional officers at Ashland, KY, who targeted him using a "buddy system" to retaliate against him for speaking out about the harsh conditions within the prison. Within a year, Capers received three 100-series disciplinary write-ups, all alleging possession of cellphones that were never found on him. In one instance, his cellmate even admitted to hiding a cellphone in a hallway area that Capers never entered, yet Capers was still found guilty.

Nonetheless, Capers has not allowed this setback to diminish his resolve. Even in the face of what he perceives as unjust treatment in the administration of his time credits and of every event in prison, he has continued to participate in classes, Aviation, completed academic levels, maintain employment, and pursue every available opportunity for self-improvement, like Creative Writing, Parenting Class, and an AA Class. His perseverance—despite systemic barriers—further highlights the sincerity of his rehabilitation and strengthens the case for his compassionate release.

It is essential to note that, Capers' discipline record reflects his sincere commitment to reform. According to his official record, there have been "NO INCIDENT REPORTS FOUND IN THE LAST 6 MONTHS." Although Capers experienced a mental breakdown while coping with his mother's worsening condition over the past year, this does not diminish his exceptional record over the course of 8.5 years. Capers has recently been transferred to another facility, is back on track with programming, and has remained disciplinary-free for the past six months.

On August 4, 2025, Capers broke his finger but was not promptly seen by a doctor. It took two weeks before he received an X-ray, and during that time, he was not given any pain medication. Because the BOP failed to provide proper medical treatment and only placed a brace on his finger, the injury did not heal correctly. As a result, he is now unable to close his left hand without his broken ring finger overlapping his

pinky. In sum, Capers' condition progressively worsened due to the lack of adequate medical attention.

Furthermore, FCI Beckley is a dangerous facility, frequently placed on lockdown due to stabbings, fights, and riots. With his injured hand, Capers would be unable to defend himself if violence were to occur. He also suffers from hypertension, high cholesterol, and prediabetes. Although he takes medication, the frequent lockdowns prevent him from maintaining proper exercise and diet as needed to manage his health.

Despite facing numerous hardships—including medical neglect, unsafe prison conditions, and personal struggles related to his mother's health—Capers has consistently demonstrated strength of character, discipline, and a sincere commitment to self-improvement. He has maintained a positive attitude, remained respectful toward staff and other inmates, and continued to engage in educational and rehabilitative programming. His perseverance in the face of adversity reflects genuine remorse, emotional growth, and a strong desire to rebuild his life.

Capers' ability to stay focused, remain disciplinary-free, and pursue constructive goals even under harsh conditions speaks to his resilience, moral integrity, and readiness to reintegrate successfully into society. This clean disciplinary history is particularly notable given the length of his incarceration and the many challenges that come with life in prison. His ability to remain infraction-free while completing

numerous rehabilitative programs underscores his serious and sustained effort to change the trajectory of his life. More so, Capers' remarkable progress in rehabilitation is all the more commendable given the challenging and often adverse conditions within the BOP. During his incarceration, Capers has endured conditions where inmates were not always housed appropriately—whether due to overcrowding or inadequate facilities. These systemic shortcomings have not only created physical discomfort, but also placed inmates at heightened risk for harm and instability. The lack of proper housing and basic resources has made it increasingly difficult for many incarcerated individuals to focus on rehabilitation or personal development.

Yet, Capers refused to allow these difficult circumstances to derail his commitment to change. Despite being subjected to an environment that can often feel chaotic and unsafe, he remained focused on bettering himself—mentally, emotionally, and physically. He proactively sought out programming, maintained steady work assignments, and stayed engaged in his rehabilitation journey, even when the system around him provided little support or safety.

This determination speaks volumes about Capers' character and personal growth. Rather than succumbing to the discouragement and distractions that often accompany such conditions, Capers maintained a positive trajectory. His ability to thrive in a setting not designed to foster personal transformation makes his

rehabilitation all the more extraordinary and supports his readiness for reentry into society. It is important to note that, Capers' record reflects more than just compliance—it reflects transformation. Through reflection, education, and accountability, he has emerged a more empathetic, mature, and responsible individual. His conduct and achievements while incarcerated clearly demonstrate that he poses no genuine safety threat to the community. Rather, his extraordinary rehabilitation provides compelling evidence that he is well-prepared for reentry and is committed to becoming a productive, law-abiding member of society.

In light of Capers' rehabilitation, good conduct, and the extraordinary circumstances surrounding his mother's declining health, he respectfully requests that this Honorable Court exercise its discretion to reduce his sentence. Capers has shown genuine remorse, significant personal growth, and a continued commitment to positive change despite the many challenges he has faced while incarcerated. A sentence reduction would not only recognize his progress but also serve the interests of justice and compassion.

Under 18 U.S.C. § 3582(c)(2), to modify Capers' sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a reduced sentence to 24 months or time served is sufficient, but not greater than necessary, and accounts for the sentencing

43

factors the court must consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

Accordingly, this motion should be granted.

## V. <u>CONCLUSION</u>

For the foregoing reason, Capers prays this Court would consider his Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018, based upon the "extraordinary and compelling reasons" and reduce his sentence.

Respectfully submitted,

Dated: ▓▓▓▓▓▓ *1st*, 2025
      *December*

DAVID CAPERS
REG. NO. 52476-424
FCI BECKLEY
FEDERAL CORR. INSTITUTION
P.O. BOX 350
GENERAL & LEGAL MAIL
BEAVER, WV 25813
Appearing *Pro Se*

44

## CERTIFICATE OF SERVICE

I hereby certify that on ~~December~~ 1st, 2025, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release pursuant to 18 U.S.C. § 3582(c)(1)(A) and First Step Act of 2018 was sent via U.S. Mail, postage prepaid, to Lauren Wheatley, Assistant U.S. Attorney at U.S. Attorney's Office (Evansville), 101 NW Martin Luther King, Jr. Blvd., Suite 250, Evansville, IN 47708.

DAVID CAPERS

David Cypers- D44 16-4D4

Federal Correctional Institution

FCI Beckley

P.O. Box 350

Beaver WV 25813

(Legal Mail)

UNITED STATES MARSHAL
PACKAGE SCREENED BY
X-RAY/MAGNETOMETER

FILED

DEC 16 2025

U.S. DISTRICT COURT
EVANSVILLE, INDIANA



Retail

RDC 99

47708

$0.00

U.S. POSTAGE PAID
FCM LG ENV
BEAVER, WV 25813
DEC 02, 2025

S2324M503995-06



Ms. Kristine Seufert
Clerk of Court
U.S. District Court
Southern District of Indiana
Evansville Division
101 Northwest MLK Blvd Room 304
Evansville, IN 47708



